IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Michael A. Montepara,                )        Civil Action No. 8:15-cv-03060-PMD-JDA
                                     )
                    Plaintiff,       )        **REPORT AND RECOMMENDATION**
                                     )        **OF MAGISTRATE JUDGE**
          vs.                        )
                                     )
Carolyn W. Colvin,                   )
Commissioner of Social Security,     )
                                     )
                    Defendant.       )

        This matter is before the Court for a Report and Recommendation pursuant to Local

Rule 73.02(B)(2)(a), D.S.C., and Title 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this

action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final

decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's

claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2]

For the reasons set forth below, it is recommended that the decision of the Commissioner

be reversed and remanded for administrative action consistent with this recommendation,

pursuant to sentence four of 42 U.S.C. § 405(g).

---

        [1]A Report and Recommendation is being filed in this case, in which one or both parties
declined to consent to disposition by a magistrate judge.

        [2]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social
Security after a hearing under paragraph (1) shall be subject to judicial review as provided
in section 405(g) of this title to the same extent as the Commissioner's final determinations
under section 405 of this title."  42 U.S.C. § 1383(c)(3).

## PROCEDURAL HISTORY

On February 7, 2013, Plaintiff filed applications for DIB and SSI, alleging disability beginning January 28, 2013. [R. 147–48, 152–160.]  The claims were denied initially and upon reconsideration by the Social Security Administration ("the Administration").  [R. 96–99, 103–104.] Plaintiff filed a request for hearing before an administrative law judge ("ALJ"), and on March 3, 2015,  ALJ Jerry W. Peace conducted a hearing on Plaintiff's claims. [R. 30–60.]

On April 7, 2015, the ALJ issued his decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act ("the Act"), from January 28, 2013, through the date of the decision. [R. 11–29.] At Step 1[3], the ALJ found Plaintiff meets the insured status requirements of the Act through March 31, 2017, and had not engaged in substantial gainful activity since January 28, 2013, the alleged onset date. [R. 13, Findings 1 & 2.]  At Step 2, the ALJ found that Plaintiff had the following severe impairments: cerebral trauma, loss of visual acuity in right eye, affective and anxiety disorders. [R. 13, Finding 3.]

At Step 3, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. [R. 13, Finding 4.]  The ALJ specifically considered Listings 2.02, 11.18, 12.04 and 12.06.  [*See Id.*]  Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can never climb ladders, ropes, scaffolds, ramps or stairs; he can frequently balance; he is limited to frequent bilateral fingering; limited to occupations requiring frequent depth perception; and his work is limited to simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only work-related decisions, and with few, if any, work place changes, with no interaction with the public.

[R. 13, Finding 5.] Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work as building maintenance worker. [R. 21, Finding 6.] In light of Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 21, Finding 10.] Thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from January 28, 2013, through the date of the decision. [R. 22, Finding 11.]

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council which denied review on June 22, 2015. [R. 1–6.] Plaintiff commenced an action for judicial review in this Court on August 4, 2015. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and contains multiple legal errors warranting the reversal and remand of the case. [*See* Docs. 14, 16.] Specifically, Plaintiff contends the ALJ:

1.  Committed reversible error in formulating the RFC by failing to adequately explain his reasons for rejecting the opinions of Plaintiff's treating physicians, treating psychiatrist, consultative examiners and other physicians and rehabilitation experts;

3

2.    Committed reversible error in failing to find that Plaintiff's depression and anxiety met the criteria of Listings 12.04 and 12.06;

3.    Erred in discounting Plaintiff's credibility without applying the factors set forth in 20 CFR § 404.1529 and SSR 96-7p;

4.    Erred in finding that Plaintiff "testified that he could lift 25 pounds, which is consistent with my RFC."; and

5.    Erred by failing to award benefits because based on the testimony of the vocational expert, considering all of Plaintiff's limitations, there was no work he could perform.

[*See* Doc. 14 at 2, 15–35.]

The Commissioner contends the ALJ's decision should be affirmed because there is substantial evidence of record that Plaintiff was not disabled within the meaning of the Act. [*See* Doc. 15.] Specifically, the Commissioner contends:

1.    Substantial evidence supports the ALJ's Listing analysis;

2.    The ALJ reasonably evaluated the opinion evidence in accordance with the regulations;

3.    The ALJ properly evaluated the Plaintiff's credibility in accordance with the regulations;

4.    The ALJ reasonably relied on the testimony of the vocational expert in finding Plaintiff was capable of work.

[Doc. 15 at 8–25.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21

5

F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."  *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim.  *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).  Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its

6

reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of*

7

*Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

8

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for

pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  *Id.* §§ 404.1574–.1575, 416.974–.975.

**B.     *Severe Impairment***

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  *See id.* §§ 404.1521, 416.921.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

**C.     *Meets or Equals an Impairment Listed in the Listings of Impairments***

10

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[5]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines

---

[5]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

11

(the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the

treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

**IV.    Medical Tests and Examinations**

14

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. §§ 404.1517, 416.917.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself,

16

> support a finding of disability.  Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered.  Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been
superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed.
Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about
pain or other symptoms are not substantiated by the objective medical evidence, the
adjudicator must consider all of the evidence in the case record, including any statements
by the individual and other persons concerning the individual's symptoms."  *Id.* at 34,485;
*see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of
pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the
record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ
must articulate specific and adequate reasons for doing so, or the record must be obvious
as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).
Although credibility determinations are generally left to the ALJ's discretion, such
determinations should not be sustained if they are based on improper criteria.  *Breeden*,
493 F.2d at 1010 ("We recognize that the administrative law judge has the unique
advantage of having heard the testimony firsthand, and ordinarily we may not disturb
credibility findings that are based on a witness's demeanor.  But administrative findings

17

based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Relevant Medical History**

On January 28, 2013, Plaintiff was admitted to AnMed Health with a self inflicted gun shot wound to the head in an attempted suicide.  [R. 291.]  Plaintiff shot himself under the mouth and the bullet traversed his sinuses up through the orbital floor and out of his skull. [*Id*.] Plaintiff underwent tracheostomy tube and gastrostomy tube replacement and, due to respiratory failure and hemodynamic instability, required mechanical ventilation. [*Id*.]  After about ten days, Plaintiff underwent a right frontal ventriculostomy in an attempt to avoid extensive skull base repair surgery.  [R. 309.]  Plaintiff was treated at AnMed's acute care from January 28, 2013, through March 1, 2013.  [R. 371.] Plaintiff was admitted to Roger C. Peace Rehabilitative hospital from March 1, 2013, through March 11, 2013. [R. 372.]

While being treated at AnMed, on February 3, 2013, Plaintiff was seen by Dr. Mark S. Wolken ("Dr. Wolken"), on referral from Dr. Jane Riester ("Dr. Riester), for an ophthalmology exam.  [R. 256.]  Plaintiff was assessed with injury to the optic pathways, papilledema associated with intracranial pressure, vitreous hemorrhaging, and orbital hemorrhaging due to a self inflicted gun shot wound to the head six days prior with fracture of the medial orbital wall on the right. [*Id*.] Dr. Wolken was unable to assess Plaintiff's vision or motility at the time due to his level of sedation, but thought it likely the orbital hematoma and trauma most likely caused permanent loss of vision. [*Id.*]  On February 7, 2013, Dr. Wolken examined Plaintiff and determined that his prognosis had improved and

18

that there was good lid closure.  [R. 259.]   Again, Dr. Wolken was unable to assess Plaintiff's vision or motility due to his level of sedation. [*Id*.]

A CT scan on February 14, 2013, showed a right anterior frontal lobe hypodensity with scattered bullet fragments and improving patchy hemorrhages; stable fracture extending from the right anterior frontal calvaria to the frontal maxillary sinus as well as the right medial orbital wall; chronic bilateral posterior frontal subdural fluid collection with minimal mass effect on the adjacent sulci; and resolution of previously seen temporal and parafalcine hemorrhages.  [R. 323–24.]

On March 18, 2013, after his release from Roger C. Peace, Plaintiff saw Dr. Joseph Abraham ("Dr. Abraham") with Carolina Primarycare & Diabetes Center, to establish care for headaches and distorted vision.  [R. 357.]   A review of systems and physical examination showed normal findings. [R. 358–59.] Plaintiff was diagnosed with insomnia unspecified, depressive disorder other, anxiety state unspecified, traumatic brain hemorrhage, fracture facial bone OT close, fracture angle of jaw closed, depression, possible allergy and acute pharyngitis.  [R. 359.]

On March 20, 2013, Plaintiff saw Dr. John Frizzell ("Dr. Frizzell") on referral from Dr. Larry Davidson ("Dr. Davidson), his neurosurgeon, and Dr. Abraham, his primary care physician.  [R. 339.]  Plaintiff complained that he had complete loss of vision in his right eye due to a traumatic brain injury, that he had recurring headaches, and that he had some variably horizontal, vertical or overlapping double vision.  [*Id*.]

On April 2, 2013, Plaintiff had an evaluation at Peace Rehabilitation Center with Matthew Mills, an occupational therapist ("Mills"). [R. 367.]  Treatment notes indicated that Plaintiff had past medical diagnoses of depression and obsessive-compulsive disorder

19

(OCD), and that he lived with his wife and step-daughter. [*Id*.] Plaintiff reported being able to handle basic activities of daily living, but needing his wife's help with advanced activities of daily living such as money management, medication management, home management, yard work, and driving. [*Id*.] Plaintiff's goals were to feel better and to increase his independence. [*Id*.] On examination, Mills found Plaintiff's sustained and selective attention were intact, but that his focused attention was impaired; his intellectual, emergent and anticipatory awareness was impaired; he made appropriate options in judgment/safety awareness; he completed functional math and basic money management tasks; and he could follow simple written and verbal directions. [R. 368.] Mills also noted that Plaintiff's muscle tone was within normal limits and that his balance was within functional limitations but that he may benefit from a physical therapy consult for a detailed assessment. [R. 369.] While Plaintiff's visual acuity was 20/20 bilaterally, Mills noted Plaintiff would benefit from neuro-opthamology consultation for more accurate assessment and prognosis. [*Id*.]

With respect to impairment observations, Mills indicated that Plaintiff's evaluation demonstrated decreased independence with basic and advanced activities of daily living; impairments with bilateral upper extremity strength coordination and right upper extremity range of motion, compromised vision, fatigue, and impairments with select aspect of cognition (attention and awareness). [R. 369–70.] At the Peace Rehab Center, Plaintiff was diagnosed as follows with an onset date of January 28, 2013: open skull based fracture; mental and behavioral problems with communication (including speech); cognitive communication disorder; and dysarthria. [R. 371.] It was also noted that Plaintiff's history was significant for depression and that he had a pre-morbid history of obsessive compulsive disorder. [*Id*.]

20

During testing, Plaintiff demonstrated mild cognitive-linguistic deficits in the areas of attention and mental flexibility, and slow new learning was noted until after approximately three trials when Plaintiff was able to demonstrate understanding of altered directions or rules. [R. 374.]  Plaintiff's social skills were appropriate, but he demonstrated poor self confidence, apparent anxiety and expressed a feeling of being burdensome to loved ones. [*Id.*]  The speech language pathologist noted that Plaintiff's psychological issues are internal distractors and appear to negatively impact new learning and recall of information. [*Id.*]  Plaintiff also demonstrated lingual swelling with fatigue from speaking which negatively impacts speech intelligibility and swallowing to a mild degree. [*Id.*]  It was recommended Plaintiff's treatment be put on hold pending neuropsychological testing results and intentions for work re-entry and that Plaintiff needs consistent psychological support to address psychological and psychiatric needs. [*Id.*]

On April 15, 2013, Plaintiff presented to Dr. Abraham on follow up to review labs. [R. 353.]  Treatment notes indicated Plaintiff was scheduled for a psych evaluation in Greenville, but that otherwise his depression, anxiety and insomnia were stable. [*Id.*] A review of systems ("ROS") showed generally normal findings.  [R. 354.]  Plaintiff was also diagnosed with hypercholesterolemia, which was new and high. [R. 355.]

Treatment notes dated April 17, 2013, indicated Plaintiff was treated in an Outpatient Brain Injury Program at Greenville Health Systems by Dr. Amy Robbins Cantillion ("Dr. Robbins-Cantillion") and case manager Lorraine Greene, M.Ed., CBIS ("Greene").  [R. 390.] Dr. Robbins-Cantillion certified Plaintiff's continuing need for therapy services, including OT, PT, ST and psychology, for an additional month. [*Id.*]

21

On April 30, 2013, Plaintiff was seen by Sheldon Herring, Ph.D. ("Dr. Herring"), a licensed psychologist and clinical neuro-psychologist, on referral from Dr. Robbins-Cantillion. [*See* R. 399–404.] Testing was conducted on May 15, 2013, and feedback provided on June 4, 2013, with the final neuropsychological evaluation completed on June 6, 2013. [*Id*.] In the written evaluation from the neurobehavioral status exam, Dr. Herring noted Plaintiff's history of self-inflicted gunshot wound to the head after a protracted period of severe depression and his treatment at both Greenville Memorial Hospital and Roger C. Peace Rehabilitation Hospital for inpatient rehabilitation. [R. 399.] Plaintiff reported problems with vision in his right eye and described decreased independence secondary to driving restrictions; decreased functional capacity secondary to fatigue and light sensitivity; some slurring of speech; significant increase in anxiety; moderate headache; decreased sensation in his left lower extremity; and a generalized decrease in strength and decreased coordination. [*Id*.] Additionally, Plaintiff reported cognitive changes related to memory and attention; decreased hearing; and decreased interest in day-to-day activities and irritability. [*Id*.]

In testing language assessment skills, Plaintiff was able to read single words and short sentences adequately. [R. 400.] Verbal and math skills fell in the average range. [R. 401.] Upon testing visual-spatial processing, Plaintiff was found to have higher level visual problem solving abilities and normal processing speed. [*Id*.] With respect to reasoning skills, Plaintiff's mental flexibility and ability to rapidly shift conceptual sets was within normal limits, suggesting an ability to rapidly respond to changing environmental demands and to track multiple cognitive tasks. [*Id*.] With respect to attention, Plaintiff demonstrated normal abilities on a measure of visual attention; both accuracy and speed of processing

were within normal limits in the context of visual scanning in the presence of distracters; and performance on complex sustained auditory attention was mildly impaired. [R. 401–02.]  Plaintiff's verbal memory was assessed in the average to high average range, and his visual memory was also noted in the average to low average range, with some testing in the mildly impaired range.  [R. 402.]  Sensory testing revealed significant restrictions in the right eye, with visual acuity within normal limits. [R. 402.]  Testing of gross motor strength (grip strength) was within functional limits bilaterally, and fine motor speed (finger tapping) was within normal limits for the left side, but mildly impaired for the right. [*Id*.]

In summary, Dr. Herring noted that Plaintiff's neuropsychological profile indicated only isolated cognitive deficits and indicated very strong cognitive recovery from his severe injury. [R. 403.]  Dr. Herring concluded that Plaintiff had average to above average verbal and visual reasoning skills; functional verbal and visual memory; isolated deficits in auditory attention and executive level reasoning consistent with diffuse but mild frontal lobe involvement; and severe levels of depression.  [*Id*.]  Dr. Herring felt Plaintiff was a good candidate for deficit specific rehabilitation, but would not recommend rehabilitation until he is further stabilized psychiatrically. [*Id*.]  Dr. Herring also did not recommend Plaintiff consider any work reentry until he has had an opportunity to pursue outpatient rehabilitation. [*Id*.]  Dr. Herring specifically noted that Plaintiff's long-range vocational potential, and any decision regarding disability, should be driven mainly by Plaintiff's psychiatric condition and other medical limitations (headaches, vision, etc.), and should not be based solely on his strong cognitive recovery. [*Id*.]

23

A psychiatric history and mental status exam was also completed on May 10, 2013, at the Brownell center by Dr. Rudolfo Jose Haeussler ("Dr. Haeussler"). [R. 472–77.] Dr. Haeussler reviewed Plaintiff's medical history and noted that both Plaintiff and his wife indicated that one of the biggest issues Plaintiff deals with from a behavioral perspective is the onset of irritability with low frustration tolerance with an onset two years ago which progressed from being intermittent to constant. [R. 473.] Plaintiff reported stiffness in his hands and wrists, as well as unsteady gait to some degree of weakness, particularly on the right side. [R. 475.] During the exam, Dr. Haeussler noted that Plaintiff's attention and concentration were adequate; his recent and remote memory were adequate; his language, including comprehension and expression, appeared to be fairly intact; and his estimated fund of knowledge appeared to be average. [*Id.*] Dr. Haeussler described Plaintiff's mood as "depressed, angry" and his affect as quite dysphoric, mostly sad, but at times a bit angry. [*Id.*] Dr. Haeussler diagnosed Plaintiff with major depressive disorder, recurrent, severe, without psychotic features; and cognitive disorder due to traumatic brain injury. [R. 476.] Dr. Haeussler noted that Plaintiff had frontal lobe syndrome, which appears to include executive dysfunction, disinhibition in mood symptoms such as depression and apathy. [R. 475.]

On August 5, 2013, Plaintiff returned to Dr. Abraham on follow up with generally normal findings on review of systems. [R. 409–12.] On August 16, 2013, Plaintiff was admitted to Greenville Health System reporting a 30-pound weight loss in three weeks, decreased appetite, insomnia unless he takes his medications, and increased frequency of headaches. [R. 418.] Plaintiff underwent a psychiatric evaluation by Dr. Edmund Parsons ("Dr. Parsons") and reported that he had been admitted involuntarily to Marshall

Pickens from AnMed Hospital because his wife thought he was going to kill her and because the Hospital felt that this was where he belonged.  [R. 421.]  Treatment notes indicated Plaintiff endorsed sleep disturbance, loss of interest in things he enjoys, feelings of worthlessness, fatigue, trouble concentrating, social withdrawal, depressed mood, and passive suicidal ideation. [R. 421.]  Plaintiff indicated he wished his suicide attempt in January of 2013 had been successful. [*Id.*]  While Plaintiff stated he was quite anxious, stays tense and tends to worry, he did not endorse panic or a clear history of PTSD or OCD.  [*Id.*]  Plaintiff reported that his marriage was very bad, his wife had been very angry since his suicide attempt, and that his step-daughter was verbally abusive to him and a "monster."  [*Id.*]  Plaintiff was assessed with major depressive disorder, moderate and recurrent without psychotic features; anxiety disorder not otherwise specified; traumatic brain injury secondary to gun shot wound; marriage and prior trauma growing up; and a GAF score of 36-37.  [R. 422.]  Plaintiff was admitted to Marshall Pickens, suicide level 3, Adult Treatment Program for approximately one week.  [R. 423.]  Plaintiff's discharge diagnosis included major depressive disorder, recurrent, severe; generalized anxiety disorder; obsessive compulsive disorder; cognitive disorder secondary to traumatic brain injury; cannabis abuse; mixed personality disorder with antisocial and borderline personality features; and a GAF of 52–53.  [R. 431.]

On September 10, 2013, Plaintiff was seen by licensed counseling psychologist Brian Keith, Ph.D ("Dr. Keith") for a consultative examination.  [R. 486–90.]  After reviewing Plaintiff's medical history, conducting a mental status exam, and speaking with Plaintiff, Dr. Keith determined that cognitively Plaintiff's abstract reasoning appeared adequate; his judgment appeared acceptable; and his overall cognitive functioning appeared to fall within

25

the average domain.  [R. 488–89.]  Dr. Keith assessed Plaintiff with major depression, cognitive disorder, not otherwise specified, a history of drug and alcohol use, borderline personality disorder traits and antisocial personality disorder traits.  [R. 489.]  Dr. Keith noted that Plaintiff should be able to complete simple to moderately complex tasks and follow simple to moderately detailed instructions, but that he also endorsed ongoing depression and ongoing suicidal ideation. [*Id.*]  Dr. Keith noted that Plaintiff appeared to be an individual in need of regular psychiatric and psychological intervention. [*Id.*] Dr. Keith opined that Plaintiff may have some difficulty in a job setting, and he may have some difficulty with sustained concentration and persistence; he would need someone to assist him in managing his money and he takes a number of medications.  [R. 490.]

On September 24, 2013, Plaintiff underwent a comprehensive medical examination by Dr. Stuart M. Barnes ("Dr. Barnes").  [R. 492–95.]  Dr. Barnes reviewed Plaintiff's medical history; noted his diagnoses of depression, borderline personality disorder, obsessive-compulsive disorder and other diagnoses; and his medication regimen of Ativan, Seroquel, Parvachol, Celexa, Trazodone and an EpiPen (for bee stings). [*Id.*] Dr. Barnes noted that Plaintiff had significant double vision and blurred vision in the right eye even with wearing a prismatic lens. [*Id.*]  On mental status exam, Dr. Barnes noted that Plaintiff seemed slightly depressed and anxious, had some involuntary facial grimaces, had normal communication skills, and that his comprehension and concentration appeared fairly normal.  [R. 493.]  On physical and neurological exam, Dr. Barnes noted generally normal findings, with the exception of some involuntary facial grimacing intermittently. [R. 493–94.] Dr. Barnes assessed Plaintiff with marked visual disturbance and significant mental health issues. [R. 494–95.]

On December 23, 2013, Plaintiff was again admitted to the hospital. [R. 502.] Plaintiff indicated that he "came to the hospital needing his medication and that they committed him." [*Id*.] Treatment notes also indicated that Plaintiff was involuntarily committed after being transported to the emergency department by the Anderson County Sheriff's Department due to alleged suicidal ideation with a plan. [*Id*.] Plaintiff apparently presented to the Anderson Veterans Affairs Medical Clinic or CBOC as a new patient saying he had run out of his psychotropic medications and had not taken any in 10 days. [*Id*.] Plaintiff endorsed depressed mood, no motivation, low energy, disrupted sleep, decreased concentration and memory, racing thoughts, social isolation and active suicidal ideations. [*Id*.] Plaintiff reported that his current marriage was stressed and his wife wanted a divorce; his home was in foreclosure; he was unemployed; and he had been turned down for social security disability. [*Id*.] Plaintiff's UDS was positive for cannabis and he admitted to smoking a joint a week. [R. 503.] A review of systems and physical exam resulted in generally normal findings with the exception of frequent squinting due to light sensitivity. [R. 505–06.] Discharge was granted by a judge on December 26, 2013, with a supply of medication, including Cholecalciferol, Duloxetine, Gabapentin, Hydroxyzine Pamoate, Quetiapine Fumarate, Simvastatin, and Trazodone. [R. 506–07.]

Plaintiff was court ordered for treatment and was seen by Dr. Michael Tran, MD, with the South Carolina Department of Mental Health ("Dr. Tran") on January 8, 2014, for an initial/extended physicians medical assessment. [R. 659–61.] On mental status exam, Plaintiff was alert and oriented; his appearance was normal; he had no psychomotor abnormalities; but his attention, concentration and memory were impaired. [Id.]

Between April 10, 2014, and May 23, 2014, Plaintiff was assessed at the Bryant Center to obtain a vocational rehabilitation occupational therapy evaluation summary.  [R. 650–51.]   Occupational therapist Tanya Lambert ("Lambert") summarized Plaintiff's functional limitations as follows:

* demonstrates inappropriate communication skills
* becomes defensive with feedback–positive or negative
* demonstrates decreased insight
* decreased attention to task
* easily distracted
* demonstrates decreased interpersonal skills
* hyper-verbal which interferes with task completion
* demonstrates decreased frustration level
* poor decision making skills
* decreased safety awareness
* reports diplopia, but improved with therapy
* decreased figure ground and possible depth perception per MVPT-3
* demonstrates increased impulsiveness
* demonstrates impatience and rushing through tasks
* does not follow fine print or details in instructions
* decreased support system
* at risk of losing home in near future due to lack of income and decreased money management

[R. 650.]  Lambert noted Plaintiff's strengths and abilities were as follows:

* friendly and cooperative with staff
* able to follow multi-step written instructions
* able to follow complex multi-step written instructions when not distracted
* able to write a letter and address envelope and email correctly
* demonstrates decreased squinting and closing of right eye as treatment progressed
* demonstrating increased visual acuity with decreased double vision as treatment progressed
* reports the need to have routine and structure

[R. 651.]

On May 27, 2014, Plaintiff saw Dr. Tran for a follow-up psychiatric medical assessment and medication check.  [R. 653.]  Plaintiff's judgment was noted to be fair; insight poor; and thought processes logical and goal directed. [R. 653–54.]

On June 30, 2014, Plaintiff was involuntarily admitted to Springbrook Behavioral Health System for ten (10) days after allegedly threatening to kill his wife and step-daughter. [R. 666–69.] According to treatment notes, Plaintiff reported that he and his wife got into an argument and his wife called the police alleging that he had threatened to beat her and her daughter with a baseball bat. [*Id.*] The police gave Plaintiff the option of going to jail or going to the emergency department. [*Id.*]  Plaintiff had 4–5 bats in his room and some guns. [*Id.*]

On examination, Plaintiff's thoughts were goal oriented; mood was depressed and angry; affect was quite angry and irritable; and his labs were positive for cannabinoids.  [R. 668.] Plaintiff was quite frustrated and angry at his hospitalization and focused all his attention on verbalizing his anger about his wife.  [*Id.*]  On July 9, 2014, Plaintiff was deemed appropriate for discharge. [*Id.*] On discharge, Plaintiff's mood was euthymic with an affect that was full and congruent; his insight and judgment were fair; his thoughts were logical and goal-directed; he denied suicidal, homicidal and violent ideations; and there were no delusions or obsessive-compulsive phenomena. [R. 669.] Plaintiff's discharge diagnoses included major depressive disorder, recurrent, severe, without psychotic features; THC dependence; Cluster B personality traits; and a GAF of 57 after an admission GAF of 25.  [*Id.*]

Plaintiff returned to Dr. Tran on July 28, 2014, on follow up and indicated that he was homeless.  [R. 655.]  Plaintiff was evicted from his home by his wife for alleged violent

behavior with two bags and no medications. [*Id*.]  Plaintiff was referred to a shelter and a homeless coalition, but was unwilling to submit to random drug screening due to his marijuana use.  [*Id*.]  On examination, Plaintiff's mood was depressed; his affect irritable; his attention and concentration were mildly impaired; his judgment was fair; and his insight was poor.  [*Id*.]

On February 25, 2015, Dr. Jose Rene Frialde ("Dr. Frialde") completed a Physician Questionnaire on behalf of Plaintiff.  [R. 847–50.]  In the questionnaire, Dr. Frialde noted that Plaintiff's impairments included right hip and leg neuropathy and problems with 3-dimensional vision acuity.  [R. 847.]  Dr. Frialde indicated that Plaintiff had emotional factors that contributed to the severity of his symptoms and functional limitations. [*Id*.]  He also indicated that Plaintiff frequently experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. [R. 848.]  Dr. Frialde opined that Plaintiff was incapable of tolerating even "loss stress" jobs due to anxiety and depression and that, as a result of his impairments, he had the following functional limitations:

* can walk 1–2 city blocks without rest or severe pain
* can sit 30 minutes at a time before needed to get up
* can stand 15 minutes at a time before
* can sit or stand/walk for less than 2 hours in an 8-hour day and needs periods of walking around during the day every 30 minutes for about 10 minutes
* needs a job that permits shifting positions at will from sitting/standing or walking
* will need to be able to take unscheduled breaks every 30 minutes for about 10 minutes each during an 8 hour day
* can occasionally lift 10 pounds, rarely lift 20 pounds and never lift over 50 pounds
* can frequently look down, occasionally turn his head right or left and look up, and rarely hold his head in a static position

       \*      can occasionally twist and stoop but rarely crouch/squat, or climb ladders
            and stairs

       \*      will have about two absences per month from work due to his impairments
            or treatment

[R. 847–50.]

On March 2, 2015, Dr. Tran wrote a letter to the Office of Disability Adjudication and Review indicating that Plaintiff had been under treatment at the Anderson Mental Health Clinic since December 4, 2013, with diagnoses including Major Depressive Disorder and a history of hospitalizations at Patrick B. Harris and Marshall Pickens Hospitals. [R. 862.] Dr. Tran opined that Plaintiff "has a critical and dire need for disability income due to his serious and persistent mental illness as well as his physical problems." [*Id*.] Dr. Tran opined that Plaintiff was unemployable; that his work history shows that he cannot hold down a job for any appreciable amount of time; and that he is unable to maintain any type of substantial or gainful activity and, therefore, should qualify for disability income. [*Id*.]

**Hearing Testimony**

Plaintiff testified that, after his suicide attempt, he has not worked and that he sells blood, as a part of a Hepatitis C study, to make money. [R. 40–41.] Plaintiff stated that he also receives food stamps, but has no other income and is not doing any jobs on the side for cash. [R. 41.] Plaintiff testified that he cannot work due mainly to his depression issues and that he has other physical problems such as vision problems, neuropathy on the right side of his body, balance issues, headaches and pains that make working hard. [R. 41–42.] Plaintiff testified that he can stand 30 minutes, sit 20 minutes, and walk 20 minutes before needing a break. [R. 43.] Plaintiff also testified that the heaviest weight

he could lift was about 25 pounds. [*Id*.]  Plaintiff testified that he occasionally has some grasping issues and trouble with his shoulders.  [R. 44.]

Plaintiff testified that he has problems with his focus and concentration such that he can read, look at the computer or TV for 20–30 minutes, at most, before having to do something different.  [R. 49.]   Plaintiff testified that he cannot sleep without waking up every hour and a half to two hours resulting in him feeling extremely fatigued and irritable during the day.  [R. 50.]   His neuropathy symptoms are also exacerbated by extended sitting or severe exertion from certain activities, like yard work or moving furniture.  [R. 51.]

The vocational expert testified that a person who could lift up to 50 pounds occasionally and 25 pounds frequently; can frequently climb ladders, ropes or scaffolds; frequently balance; is limited to frequent bilateral fingering; is limited to one or two-step tasks with only occasional interaction with the public, would be able to perform certain jobs in the national economy such as landscape specialist, assembler of metal furniture or sweeper/cleaner.  [R. 55–56.]   A person with the same limitations, plus limitations to occupations requiring frequent depth perception; simple, routine and repetitive tasks in a work environment free from fast-paced production requirements involving only simple, work related decisions; and no interaction with the public, could still perform the jobs of sweeper/cleaner and landscape specialist, and could also work as a dishwasher.  [R. 56–57.]

The vocational expert testified that a person with the same limitations outlined above who was limited to light work, lifting up to 20 pounds occasionally and 10 pounds frequently, could work as a folder in a laundry, as a final inspector, or as a checker (verifying orders against written records).  [R. 57.]

32

On cross examination, the vocational expert testified that if, due to a person's impairments they are unable to persist in an eight hour work day such that they are limited to sitting, standing, or walking a total of 4 hours or less per 8-hour work day, there would be no jobs for that person.  [R. 58.]  The vocational expert also testified that, if a person could only sustain concentration, persistence or pace for up to a third of a workday, there would be no jobs for that person.  [*Id*.]  Additionally, the vocational expert testified that, at this skill level, missing three days of work per month would result in termination; missing two days a month would be up to the discretion of the boss.  [*Id*.]  Furthermore, if a person's limitations required him to rest for ten minutes of every 30 minutes worked, there would be no jobs available.  [R. 58–59.]

**RFC in light of Treating Physician and Other Source Opinions**

Plaintiff agues the ALJ's RFC findings are not supported by substantial evidence because he committed reversible error by improperly rejecting the opinions of Plaintiff's treating psychiatrist, family physician, consultative examiners, and other rehabilitation experts about Plaintiff's ability to do sustained work.  [Doc. 14 at 16.]  Specifically, Plaintiff contends the ALJ offered little explanation as to the weight assigned to Dr. Tran's opinion. [*Id*. at 18–20.]  Plaintiff also challenges the ALJ's rejection of Dr. Frialde's opinion which failed to include the application of the factors required to be considered under the Treating Physician Rule. [*Id*. at 21–23.]  Lastly, Plaintiff contends the ALJ erred in his consideration of the opinions of Dr. Barnes and Dr. Keith, and his complete failure to consider the opinions of occupational therapists Lambert and Herring.  [*Id*. at 23–25.] The Court agrees.

### *ALJ's Treatment of Medical Opinions*

The ALJ explained his review and weighing of the medical evidence as follows:

As for the opinion evidence, I give some weight to the mental assessment made by Dr. Price at the initial level (2A) and some weight to the opinion of Dr. Neboschick at the reconsideration level (5A).  However, evidence submitted at the hearing level warrants change in that the claimant has one or two repeated episodes of decompensation, each of extended duration.  He has been admitted involuntarily for psychiatric treatment discussed below. Nevertheless, the claimant has been performing odd jobs to supplemental his income, which reflects his ability to perform some type of work.

I agree and give some weight to the physical assessments made by Dr. El-Ibiary and Dr. Ferrell at the initial and reconsideration levels that the claimant is capable of medium work with the additional limitations. I gave some greater postural limitations noted in my RFC based on new evidence submitted at the hearing level. Due to his vision, I find he must never climb ladders, ropes, scaffolds, ramps or stairs.
. . .

I give some weight to opinion of Dr. Keith in Exhibit 12F, and the RFC reflects this information. The claimant said that he engages in simple tasks.  Cognitively, his skills still appear to be intact even though he did sustain a gunshot wound to the head.  He performs odd jobs to supplemental his income.  He is working with Vocational Rehab to find a job.

I give little weight to Dr. Barnes in Exhibit 13F, as the claimant has been working, and continues to look for work. In fact, he reports frustration due to not being able to find work. He performs odd jobs to supplemental his income.

I give little weight to the opinion of Dr. Frialde in Exhibit 29F. The medical evidence of record does not support his opinion. The claimant states he "never leaves group feeling worse but his mood improves (Exhibit 25F/2). He states that he performs odd jobs to supplemental his income (Exhibit 25F/28), reflective of his ability to do some type of work. The opinion is quite conclusory, providing no explanation of the evidence relied on in forming opinion.

In a Statement by Michael Tran, MD of Anderson- Oconee-Pickens Mental Health, the claimant is unable to maintain any type of substantial or gainful activity.  He should therefore qualify for disability income (Exhibit 31F).  I give his opinion

little weight as the claimant has been working with a friend and continues to look for work.  He said he tries to stay busy with possible odd jobs to supplement his income (Exhibit 25F/28). I find this statement inconsistent with him working with Vocational Rehab to find work (Exhibit 26F/2). Throughout the record, he has consistently denied suicidal, homicidal ideations, delusions or obsessions. He is alert and oriented with intact remote and recent memory. He has mild attention and concentration impairment December 22, 2014, claimant's mood was improved stating he attended the local veterans helping veterans support group where he reported feeling happy with the group. He was very expressive and mentioned "cat therapy" as his cat is his main support system. His mood improved with discussing his cat. He states he "never leaves group feeling worse but his mood improves (Exhibit 25F/2). When he takes his medications, he does well without problems or side effects (Exhibit 25F/59). He is making progress through mental health treatment in that he is showing good desire and initiative in capitalizing all available resources to address his needs. He can identify when he needs extra help and looking for work (Exhibit 25F/90, 26F).

[R. 20–21.]

### *Discussion*

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court.  *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 520. The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist."  *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir.2005) (citing 20 C.F.R. § 404.1527).  ALJs typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id*. (*quoting Mastro*, 270 F.3d at 178).  While

the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 416.927(c).  Additionally, SSR 96–2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996).  The law is clear that the opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F .R. §§ 404.1527(d)(2), 416.927(d)(2) (2006).

With respect to the ALJ's weighing of the medical opinions, the Court is unable to discern any consideration by the ALJ of the factors required to be considered in SSR 96–2p with respect to treating physicians, non-treating physicians, or consultants.  It appears the ALJ merely declined to accept the opinions of Plaintiff's treating physicians (and other medical opinions of record) with respect to Plaintiff's ability to work solely based on his finding that Plaintiff tried to stay busy to supplement his income.  Instead of following the Treating Physician Rule and explaining why the medical opinions were not supported by or inconsistent with the medical evidence of record,  the ALJ cited two instances where Plaintiff indicated that he worked or attempted to work.  In one instance, around September 24, 2014, Plaintiff indicated he assisted his roommate with his tree cutting business by

36

cleaning up after the roommate cut down tree limbs; yet, progress notes from this session indicated he was unemployed. [R. 725.] In another instance, around August 22, 2014, Plaintiff reported that he tried to stay as busy as possible with odd jobs to supplement his income; yet, progress notes indicated he was unemployed. [R. 735.] There is no indication as to what these jobs were, how long they lasted, the reason they ended, what Plaintiff was paid, or what Plaintiff's responsibilities were on these jobs. Thus, it is unclear from the ALJ's decision, what it was about these two instances of Plaintiff indicating he performed odd jobs that would be significant enough to overcome the medical evidence of record indicating that Plaintiff was unable to persist in an 8-hour a day job due to his mental impairments. *Cf.* Report and Recommendation, *Wallace v. Colvin*, C/A No. 8:14-4395-DCN-JDA, 2016 WL 624947, at *14–16 (D.S.C. Jan. 21, 2016) (discussing an unsuccessful work attempt and citing 20 C.F.R. § 404.1574(a)(1)(4)), *adopted by* 2016 WL 524269 (Feb. 10, 2016).

The ALJ also appears to rely on the fact that Plaintiff worked with Voc Rehab to find work, but failed to explain his consideration of Plaintiff's difficulty in finding employment [R. 838], or Voc Rehab's findings with respect to Plaintiff's functional limitations, particularly his decreased attention to task, the fact that he was easily distracted, had poor decision making skills, and/or had hyperverbal tendencies that interfered with his ability to complete tasks. [R. 226.] In other words, the fact that Plaintiff had the desire to make some money and find employment (and met with Voc Rehab in this effort) does not equate to Plaintiff having the ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule).

Additionally, the ALJ erred by failing to discuss and weigh the medical opinions of Dr. Herring and the opinions of occupational therapist Tanya Lambert.  Upon review of the ALJ's decision, this Court does not see any discussion of those opinions.  As noted above in the relevant medical history, both Dr. Herring and Lambert noted that Plaintiff had certain mental impairments.  The ALJ's discounting of Plaintiff's mental limitations as presented by several treating physicians and other sources is important particularly in light of the vocational expert's testimony that limitations in concentration, persistence, or pace, and/or missing work three days or more in a month would result in a finding that there are no jobs available for Plaintiff.  [*See* R. 58.]

Based on the above, the Court is unable to determine that the ALJ's decision is supported by substantial evidence.

**Remaining Allegations of Error**

The Court has determined that this case is subject to remand based on the ALJ's failure to properly apply the Treating Physician Rule in this matter.  Upon remand, the ALJ is to take into consideration Plaintiff's remaining allegations of error.

<u>**CONCLUSION AND RECOMMENDATION**</u>

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be REVERSED pursuant to sentence four of 42 U.S.C. § 405(g), and the case is REMANDED to the Commissioner for further administrative action consistent with this Report and Recommendation.

**IT IS SO RECOMMENDED**.

October 18, 2016                          s/Jacquelyn D. Austin
Greenville, South Carolina           United States Magistrate Judge

38